[No. B075764. Second Dist., Div. One. Dec. 14, 1993.]

WESTERN UNION FINANCIAL SERVICES, INC., Plaintiff and Appellant, v.
FIRST DATA CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Morrison & Foerster, Barbara A. Reeves, John P. Lodise and Andree S. Daly for Plaintiff and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Douglas B. Adler, Garrett J. Waltzer and Tali Shaddow for Defendants and Respondents.

**OPINION**

**VOGEL (Miriam A.), J.**—Western Union Financial Services, Inc., sued First Data Corporation and its wholly owned subsidiary, Integrated Payment Systems (IPS), alleging violations of the Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.)[1] arising from First Data's sale of certain money transfer services below cost during a five-month promotion aimed at Western Union's customers. We affirm the trial court's order denying Western Union's request for a preliminary injunction, rejecting its claims that the trial court (1) incorrectly defined the "product" at issue and (2) erroneously concluded that First Data did not have the requisite injurious intent.

### FACTS

For decades, Western Union owned the nation's largest money transfer business and was the only company offering money transfers on a nationwide basis. In 1988, First Data entered the field (it calls its service "MoneyGrams") and the two companies now share the national money transfer market, albeit unequally.[2]

First Data's MoneyGram business is substantially smaller than Western Union's money transfer operation (Western Union has about 18,000 agents

---

[1] All section references are to the Business and Professions Code.

[2] In the money transfer business, a customer who wants to transfer money to someone out of town (or out of state or out of the country) goes to a Western Union or First Data agent, hands over the money to be transferred, plus a fee, and provides the name and address of the transferee. By an electronic transaction, the money is transferred instantly to the designated location, ready for retrieval by the transferee upon presentation of appropriate identification. A transfer sent and received within the United States (including Puerto Rico and the Virgin

in the United States, First Data about 8,000). To boost its client base, First Data has attempted to establish name recognition (something Western Union already has) and to attract loyal customers with a sufficient volume of money transfer business to support its worldwide network of agents. To this end, First Data announced a nationwide price-reduction and sales promotion campaign for domestic money transfers, scheduled to run from April through August 1993, and intended to "generate broad appeal, improve its name recognition, and attract new and repeat customers." First Data hoped to increase its market share from 7 to 14 percent and, in its own words, to become "a viable competitor of Western Union in the money transfer business."

For domestic transfers of $300 and under, First Data reduced its price to a flat $9, down from fees of $12 to $22 for transfers in this range. Western Union's charges for the same transfers range from $13 to $29. First Data's accompanying advertising campaign was not subtle. In one television commercial, a former figure skating champion exclaims, "I was lucky enough to have skated for the gold. Forget Western Union, come into the fold." In another, a former basketball star explains, "MoneyGram lets you send up to $300 for 9 bucks. At $29, the opponent could only say, 'Aw shucks.' " On a banner at a convention, members of the check cashing industry (many of whom are also money transfer agents) were told, "MoneyGram prices are making Western Union green with envy." And so on.

Western Union was not amused and on May 5, 1993, it sued First Data (IPS was named in a first amended complaint), asserting two causes of action based on alleged violations of the Unfair Practices Act and a third cause of action for intentional interference with prospective economic advantage. The complaint seeks statutory, general and punitive damages and injunctions to restrain First Data's allegedly "below cost" and "loss leader" transfers (§§ 17043, 17044).[3] The next day, Western Union applied for a temporary restraining order, which was denied, and the matter was set for hearing on Western Union's request for a preliminary injunction to restrain First Data from advertising or selling domestic money transfers of $300 or less at a price below $20.

Relying on a single document created by a nonmanagement First Data employee (and disregarding all of First Data's other books and records),

Islands) is a "domestic" transfer. A transfer to or from or within Mexico is a "Mexico" transfer. All other transfers are "international" transfers.

[3]Section 17043 makes it unlawful to sell any product or article below the vendor's cost for the purpose of injuring a competitor or destroying competition. Section 17044 makes it unlawful to sell any article or product below cost in order to divert trade or otherwise injure competitors.

Western Union presented expert testimony that if all domestic transactions are considered (and not just those under $301), First Data's average cost is about $37.91 in "total expenses" (including agents' commissions) for each domestic money transfer; and if *all* transfers (including domestic, Mexico and international) are considered, First Data's costs are "at least" $20.80 and "as much as" $26.60 in "total expenses" for each transfer. These figures show, claimed Western Union, that First Data's $9 fee for transfers under $301 was clearly "below cost."

Western Union also presented evidence of its own operations to show money transfers could not be transacted for the price at which First Data was selling its services, and evidence to show damages as a direct result of First Data's promotion. As evidence of First Data's intent to injure, Western Union pointed to the advertising campaign and other promotional materials which directly targeted Western Union.

According to First Data's evidence, it operates its MoneyGram business on the "rose by any other name theory"—a money transfer is a money transfer is a money transfer, without differentiation between domestic, Mexico or international transfers. (Shakespeare, Romeo and Juliet, act II, scene ii ["What's in a name? That which we call a rose, by any other name would smell as sweet"].) In First Data's view, it doesn't matter whether the customer wants to send $100 or $1,000 to a domestic or a foreign destination—First Data wants the customer's money-transfer business regardless of the amount of the transfer or the destination. All transfers use the Money-Gram service mark. All are transmitted through the same operating system. And all are serviced by the same personnel and support structure, with all customer service responses originating from the main office in Denver, Colorado. For all accounting and management purposes, First Data therefore does not "break out" or separately account for costs or profitability from domestic or international transfers, nor does it in the ordinary course of business segregate costs or profitability on the basis of the dollar amount of the money transfer or by state of origin.

In order to respond to Western Union's claims, however, First Data (using accounting methods verified by its outside auditors) identified average revenues (about $17.31 per transaction) and costs (about $16.26 per transaction) associated with all money transfer services originating in California (domestic, Mexico and international) for the promotion period and fixed

its estimated "California MoneyGram pre-tax profit" for that period at $38,000.[4]

Although First Data candidly admitted the obvious—that the promotion was designed to entice its only competitor's customers to patronize First Data instead, First Data also presented evidence to show its promotion was not intended to injure or destroy Western Union but only to make its own business more competitive. In First Data's words, for its money transfer business to become profitable, it "has to increase its customer base. Western Union is such a large force that, by necessity, an improvement in [First Data's] competitive position will come, at least in part, at the expense of Western Union. This is no secret inside [First Data] (or anywhere else, for that matter) and, indeed, various of our advertising efforts during this campaign have identified Western Union explicitly." As First Data views its advertising campaign, the identification of Western Union by name is essential to First Data's effort to identify itself as a viable alternative to Western Union, "whose name is practically synonymous with the money transfer business . . . ."

The trial court denied Western Union's request for a preliminary injunction, finding (1) that First Data was making a profit on its California transactions, both generally and during the promotional period (and therefore was not selling its product below cost), and (2) that its promotional efforts were not in any event intended to injure or destroy Western Union but merely to build First Data's customer base which, under the circumstances of a two-competitor industry, necessarily included a reduction in Western Union's customer base. Western Union appeals.

DISCUSSION

I.

Western Union contends the trial court was required, as a matter of law, to treat domestic money transfers as a separate "article" or "product"

---

[4]In its reply papers, Western Union insisted the determination whether First Data is selling domestic MoneyGrams below cost must be based on a comparison of the cost of domestic transfers (not all transfers) to the price charged for domestic transfers (which is the way Western Union keeps its books). This is so, according to Western Union, because it is merely "incidental" that domestic, Mexico and international transfers share the MoneyGram name and some common resources and their distinctions outweigh their similarities—domestic money transfer consumers are primarily "emergency-prone households" sending money infrequently, whereas international money transfer consumers are primarily permanent or guest workers living in the United States and regularly transferring funds to their families in their countries of origin.

within the meaning of the Unfair Practices Act and to consider only those costs and charges directly attributable to domestic money transfers in determining whether First Data was selling below cost. We disagree.

Under section 17043, "[i]t is unlawful for any person engaged in business within this State to sell *any article or product at less than the cost thereof* to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." (Italics added.) Under section 17044, "[i]t is unlawful for any person engaged in business within this State to sell or use *any article or product* as a 'loss leader' . . . ." (Italics added.)[5] "Article" and "product," as used in both sections, are defined by section 17024 to include "any article, product, commodity, thing of value, service or output of a service trade." To help us construe these provisions, section 17001 explains "that the purpose of [the Unfair Practices Act] is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." To this end, the act "shall be liberally construed that its beneficial purposes may be subserved." (§ 17002.)

A money transfer qua money transfer is clearly a product within the meaning of the Unfair Practices Act and neither party contends otherwise. (Cf. *Los Angeles Check Sellers Assn.* v. *United States Nat. Bank* (1969) 275 Cal.App.2d 570, 573 [80 Cal.Rptr. 321] [a money order is a product within the meaning of the act]; *Garner* v. *Journeyman Barbers' etc. Union* (1963) 223 Cal.App.2d 101, 107 [35 Cal.Rptr. 693] [as is a haircut]; *Independent Journal Newspapers* v. *United Western Newspapers, Inc.* (1971) 15 Cal.App.3d 583, 587 [93 Cal.Rptr. 299] [and classified advertising space in a newspaper]; *Paramount Gen. Hosp. Co.* v. *National Medical Enterprises, Inc.* (1974) 42 Cal.App.3d 496, 503-504 [117 Cal.Rptr. 42] [and a lease-service medical office building rental package]; 19 Ops.Cal.Atty.Gen 88 (1952) [and wine marketing]). But Western Union goes one step further, contending a domestic money transfer is one product, a Mexico transfer is another, and an international transfer is yet a third separate product. First Data disagrees, returning to its refrain—a money transfer by any other name is still a money transfer.

*Turnbull & Turnbull* v. *ARA Transportation, Inc.* (1990) 219 Cal.App.3d 811 [268 Cal.Rptr. 856], explains why, on the facts of this case, we agree

---

[5]In the context of this case, a "loss leader" means any article or product sold at less than cost "[w]here the effect is to divert trade from or otherwise injure competitors." (§ 17030, subd. (c).)

with First Data. In *Turnbull*, where a provider of bus transportation services "low-balled" its bid for a county contract, the defendant claimed on appeal that, under the Unfair Practices Act, the method for determining whether a service is sold below cost is arbitrary and irrational.[6] In rejecting this due process attack, the Court of Appeal held that under sections 17026 and 17029, which define "cost" to include all variable and fixed costs, the Unfair Practices Act employs a "fully allocated cost" approach to determine whether a sale has violated section 17043, an approach which reflects that portion of the firm's total costs attributable on an average basis to each "unit of output." (*Turnbull & Turnbull* v. *ARA Transportation, Inc.*, *supra*, 219 Cal.App.3d at pp. 819-820.) Since this method is rationally related to the valid legislative purpose of the Act, it is neither arbitrary nor irrational and thus not subject to a due process attack. (*Id.* at pp. 822-823.)

But a "unit of output" is a product, not a subclass of products. As the Court of Appeal explained in *Turnbull*, a rule which would permit a large multiproduct company to allocate costs disproportionately among its products and then reduce its prices for an item manufactured by a small single-product competitor would foster rather than deter unfair competition. The single-product company could not meet its multiproduct competitor's artificially low prices and could be driven from the marketplace, leaving the multiproduct competitor free to reallocate its costs and attack some other competitor's product line. "The fully allocated cost method, although not perfect, prevents this method of monopolization by requiring that a pro rata portion of the multiproduct competitor's overhead and fixed costs be included in its [product] cost figures." (*Turnbull & Turnbull* v. *ARA Transportation, Inc.*, *supra*, 219 Cal.App.3d at p. 822.)

The potential for this problem does not exist in the context of this case and we therefore see no reason to permit Western Union to dictate the manner in

---

[6]"Cost" is defined by section 17026 as follows: " 'Cost' as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer. [¶] 'Cost' as applied to distribution means the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor, plus the cost of doing business by the distributor and vendor and in the absence of proof of cost of doing business a markup of 6 percent on such invoice or replacement cost shall be prima facie proof of such cost of doing business. [¶] 'Cost' as applied to warranty service agreements includes the cost of parts, transporting the parts, labor, and all overhead expenses of the service agency. [¶] Discounts granted for cash payments shall not be used to reduce costs."

Section 17029 defines "cost of doing business" or "overhead expense" as "all costs of doing business incurred in the conduct of the business and shall include without limitation the following items of expense: labor (including salaries of executives and officers), rent, interest on borrowed capital, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

which its competitors must account for their costs and profits. First, both parties are multiproduct companies—Western Union sells telegrams as well as money transfers and First Data provides a utility payment service and sells official checks and money orders. Second, there is no evidence that First Data has attempted to shift costs from its money transfer business to any of these other products or services, the practice condemned in *Turnbull*. Third, there is nothing in *Turnbull* (or anywhere else) to suggest that the first company to enter a field can define a product line by foisting its own accounting procedures on other companies when they attempt to compete. In short, the fact that Western Union segregates domestic and Mexico and international transfers to determine its own costs and profit does not mean it can compel First Data and all future competitors to do likewise.

As First Data points out, if costs must be allocated separately to domestic, Mexico and international transfers in order to determine whether a short-term promotion aimed at one of those markets is offered below cost, it would seem to follow that a promotion targeting a point of origin or destination or specific days of the week when business is slow would create a separate "product" and require a separate allocation of costs. This would be an absurd result, which is something we try to avoid, particularly where it would not further the purpose of the statute. (Compare *American Drugs, Inc.* v. *Wal-Mart Stores, Inc.* (Ark.Ch.Ct. Oct. 12, 1993) 1993-2 Trade Cas. (CCH) ¶ 70,382 [when a chain of drug stores sues the world's largest discount store for selling pharmaceutical, health and beauty aid product lines below cost, the relevant cost is that attributable to the "product line" at issue, not the "market-basket" cost].)[7]

For these reasons, we conclude First Data's classification of all money transfers as one product is permissible (it is not unfair, dishonest, deceptive, destructive, fraudulent or discriminatory) and First Data is not required to allocate costs according to some artificial subproduct standard dictated by its competitor.

---

[7]Wal-Mart lumped together all pharmaceuticals and health and beauty aids and contended, in effect, that it was immaterial whether one brand of aspirin was sold below the cost of that single item because it sold other items (hand creams, hair brushes and hot water bottles) above cost. Without explanation and without defining a "product" or a "product line," the Arkansas trial court simply rejected Wal-Mart's "market-basket" defense. It cannot be determined from the opinion whether the court would have accepted an accounting method which differentiated among the three "product lines" (pharmaceuticals as one product line, health aids as another and beauty aids as a third) or whether each item within each line had to stand or fall on its own. Under Western Union's approach, each pharmaceutical product and each health and beauty aid would have to be treated as a separate "product." Fortunately, we need only decide the case before us and we therefore express no view about whether each brand of aspirin, after-shave and astringent has to be separately evaluated.

## II.

Western Union contends the trial court improperly excluded First Data's non-California advertising costs in determining whether First Data sold its California money transfers below cost. First Data disputes the underlying premise, pointing to evidence which shows its cost analysis allocated a portion of all costs, including non-California advertising costs, to transactions originating in California. What this means is that there is a factual dispute about the manner in which costs were computed (*Turnbull & Turnbull* v. *ARA Transportation, Inc.*, *supra*, 219 Cal.App.3d at p. 820) and what that means is that we will not disturb the trial court's findings (*People* v. *Black's Food Store* (1940) 16 Cal.2d 59, 61 [105 P.2d 361] [where there is conflicting evidence, the denial of a preliminary injunction is within the trial court's discretion]; *Ellis* v. *Dallas* (1952) 113 Cal.App.2d 234, 241 [248 P.2d 63]). Simply put, Western Union has not shown an abuse of discretion (a decision exceeding the bounds of reason or contravening uncontradicted evidence). (*Scaringe* v. *J.C.C. Enterprises, Inc.* (1988) 205 Cal.App.3d 1536, 1542 [253 Cal.Rptr. 344].)[8]

## III.

Finally, Western Union contends the trial court should have found that First Data intended to injure Western Union or to destroy competition. We disagree.[9]

Under section 17043, it is unlawful to sell below cost "for the purpose of injuring competitors or destroying competition." Under section 17044 (read as required in conjunction with section 17030), it is unlawful to sell a product below cost as a "loss leader" where "the effect is to divert trade from

---

[8]We summarily reject Western Union's related contention that the trial court improperly admitted into evidence the declarations of First Data's experts (because they relied on "hearsay outside the record" and contradicted First Data's "admissions"). The hearsay issue is a red herring (*In re Fields* (1990) 51 Cal.3d 1063, 1070 [275 Cal.Rptr. 384, 800 P.2d 862] [an expert may base his opinion on reliable hearsay]). The "admissions" issue ignores the trial court's implicit finding that the document prepared by the First Data nonmanagement employee for his own purposes (the one Western Union relied on to calculate First Data's "costs") was *not* an "admission" that First Data kept records which First Data insisted it didn't keep.

[9]One could say this point is moot in light of our conclusion that there was no sale below cost (the statute requires both elements). But one could also say (and First Data has said it in a motion to dismiss Western Union's appeal filed after the case was fully briefed) that the entire case is moot since First Data's promotion ended in August. We choose instead to say that, having gone this far, we may as well finish what we started—both issues are likely to arise again with these parties and both points are of general public interest.

or otherwise injure competitors."[10] Under both sections, "proof of one or more acts of selling or giving away any article or product below cost or at discriminatory prices, together with proof of the injurious effect of such acts, is presumptive evidence of the purpose or intent to injure competitors or destroy competition." (§ 17071.)

Assuming First Data had sold a product below cost and assuming Western Union had proved damages, the obvious and only effect of the presumption created by section 17071 was to require First Data to go forward with proof to negate the presumption of wrongful intent. (*People* v. *Pay Less Drug Store* (1944) 25 Cal.2d 108, 114 [153 P.2d 9].) That is precisely what First Data did when it presented evidence of its good faith intent to use this promotion to increase and maintain its customer base (*Dooley's Hardware Mart* v. *Food Giant Markets, Inc.* (1971) 21 Cal.App.3d 513, 518-519 [98 Cal.Rptr. 543]) and the fact that other evidence might have given rise to conflicting inferences is immaterial (*Ellis* v. *Dallas, supra*, 113 Cal.App.2d at p. 237).

Once a presumption is rebutted, the burden shifts back to the moving party to offer actual proof of injurious intent. (*Dooley's Hardware Mart* v. *Food Giant Markets, Inc., supra*, 21 Cal.App.3d at pp. 517-518.) The evidence Western Union points to does not meet this burden. The fact that First Data's advertising targeted Western Union by name does not prove an intent to injure and Western Union offers no authority to the contrary. Similarly, the fact that First Data's internal documents show the promotion was intended to capture a customer base from Western Union is immaterial because that is something First Data was entitled to do. (*Id.* at pp. 518-519; see also *Triangle Publications* v. *Knight-Ridder Newspapers* (5th Cir. 1980) 626 F.2d 1171, 1176, fn. 13, quoting the Federal Trade Commission, 16 C.F.R. § 14.15(c) (1980) ["Comparative advertising, when truthful and nondeceptive, is a source of important information to consumers and assists them in making rational purchase decisions. Comparative advertising encourages product improvement and innovation, and can lead to lower prices in the marketplace"].)

In search of something to show injurious intent, Western Union points to evidence that First Data was attempting to acquire Western Union from its parent, New Valley Corporation (which was and we think still is in bankruptcy). The most we can say about this fact is that it arguably gives rise to

---

[10]We read both statutes to require an injurious intent (a specific intent to injure or destroy) and not just an intent to divert customers from a competitor. (*Hladek* v. *City of Merced* (1977) 69 Cal.App.3d 585, 591 [138 Cal.Rptr. 194] [an intent to injure competitors or destroy competition is an essential element in a cause of action under §§ 17043 and 17044].)

an inference that First Data had a motive to attempt to injure Western Union, to force New Valley to the bargaining table. But the trial court clearly rejected this inference, expressly finding that First Data's promotion was intended to build its MoneyGram business by increasing its market share from 7 percent to 14 percent, not by destroying or injuring Western Union.

And as the trial court recognized, these facts must be viewed in context where, as here, there are only two competitors in the industry and "a building of [First Data's] customer base necessarily includes a reduction in the base of the dominant . . . party," Western Union. While we do not mean to suggest that the result will always be the same in a two-competitor industry (compare *Uneedus* v. *California Shoppers, Inc.* (1978) 86 Cal.App.3d 932 [150 Cal.Rptr. 596] [where the market in which the parties competed could support only one advertising newspaper]), we do hold, in this case, that Western Union's dominance of a two-competitor industry is a factor militating against its interpretation of First Data's intent when it targeted Western Union's customers in an effort to increase its own market share.

## DISPOSITION

The order is affirmed.

Spencer, P. J., and Ortega, J., concurred.