Filed 7/29/15  Dixon Gas Club, LLC v. Safeway Inc. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DIXON GAS CLUB, LLC, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SAFEWAY INC., <br><br> Defendant and Respondent. | A139283 <br><br> (Alameda County <br> Super. Ct. No. VG08387771) |

This is an appeal from judgment after the trial court dismissed a lawsuit brought by plaintiff Dixon Gas Club, LLC (Dixon) against defendant Safeway, Inc. (Safeway) under California's Unfair Practices Act (Bus. & Prof. Code, § 17000 et seq.)[1] and unfair competition law (§ 17200 et seq).  This dismissal followed the trial court's rejection of Dixon's claims that Safeway had unlawfully and unfairly engaged in below-cost sales and used "loss leaders" in connection with the sale of fuel at Safeway's retail fuel station on the I-80 corridor in the City of Dixon.  For reasons discussed below, we agree with the trial court's decision and, thus, affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 15, 2008, a complaint was filed by Dixon asserting the following causes of action against Safeway:  below-cost sales in violation of the Unfair Practices Act (hereinafter, UPA) (§ 17043); loss leader sales in violation of the unfair competition law

---

[1]     Unless otherwise stated, all statutory references herein are to the Business and Professions Code.

(hereinafter, UCL) (§ 17044); unlawful business practices in violation of the UCL and premised on the alleged violations of sections 17043 and 17044 (§ 17200); and unfair business practices in violation of the UCL (§ 17200).[2] After an extensive discovery process and, ultimately, a 10-day bench trial involving 17 witnesses (including seven Safeway officers or employees, eight market participants, and two experts), we are left with the following record.[3]

Dixon operated a retail fuel station just off the I-80 exit in the City of Dixon that served both private motorists and big-rig trucks. Safeway, in turn, operated a retail fuel station off a different I-80 exit in the City of Dixon that served motorists, but was not configured in a manner suitable for big-rig truck refueling. During the relevant time period, 2004 to 2012, at least eleven, if not more, retail fuel stations operated in the same general area.

---

[2] Section 17043 makes it unlawful for "for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition." (§ 17043.)
Section 17044, in turn, makes it unlawful for "any person engaged in business within this State to sell or use any article or product as a 'loss leader' as defined in Section 17030 of this chapter. (§ 17044.)
A "loss leader" under the UPA means "any article or product sold at less than cost: [¶] (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or [¶] (b) Where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers; or [¶] (c) Where the effect is to divert trade from or otherwise injure competitors." (§ 17030.)

[3] On May 7, 2012, the trial court granted Dixon's request for preliminary injunction, thereby enjoining Safeway from setting the street price at its City of Dixon station at a level whereby, after deducting the three-cents-per-gallon discount for Safeway Club Card holders, the transaction price for fuel was below its total cost. At the same time, the trial court denied Dixon's request for preliminary injunction to enjoin Safeway from issuing fuel discounts under a separate rewards program the company offered grocery customers (discussed in greater detail herein). Following issuance of this preliminary injunction, Safeway discontinued its Club Card program. Subsequently, on September 25, 2012, Dixon filed a supplemental complaint adding allegations that Safeway's below-cost sales and use of loss leaders had continued since the initial complaint was filed.

2

Safeway, a large grocery chain, operated a number of retail fuel stations in the United States besides its City of Dixon fuel station. Safeway generally recognized three types of target competitors in the areas in which it operated these fuel stations.[4] So-called "majors" included major branded stations like Shell, Chevron and Texaco. These competitors generally operated at higher costs and higher margins than Safeway. "Pricers" or "low price marketers" included stations like Arco, Racetrack or independents, which generally operated at lower prices and margins than Safeway. Lastly, "hypermarkets" were those, like Safeway, that sold food and dry goods in addition to fuel. The hypermarkets included Albertsons, Kroger and Costco. Generally, these stores operated at high volume and lower prices and margins.

Safeway's general policy for setting fuel prices at its City of Dixon fuel station between 2004 and 2006 was to survey on a daily basis the fuel prices of select nearby stations, and to then set the Safeway price based on the surveyed prices. These select stations generally would include no more than three target competitors. Generally, Safeway identified its target competitors as majors and applied the following price strategy: If Safeway's fuel margins were positive, its strategy was to set its retail or "street" price two cents per gallon higher than the price of its lowest surveyed target competitor. Conversely, if the margins at Safeway's fuel station were negative, it would set its street price at four cents per gallon higher than the price of its lowest surveyed target competitor.[5] Dixon's fuel station was not among the stations that Safeway surveyed for price information because Safeway did not consider Dixon to be a competitor in its fuel market. In any event, sometime in 2006, Safeway implemented a

---

[4]    Broadly speaking, target competitors were defined as those "who could take the most volume away."

[5]    The term "margin" in this context refers to the difference between Safeway's "rack" price (i.e., the wholesale price Safeway paid for the fuel) and its street price (i.e., the price posted at Safeway's station). Safeway's fuel supplier during the relevant time period was Tesoro Refining and Marketing Company (Tesoro). The price Safeway paid for this fuel was a matter of contract. The parties negotiated the formulas used to set daily fuel prices in order to safeguard against market uncertainty or turbulence.

software module for its daily fuel pricing in lieu of having an employee manually survey pricing at the selected stations.

Safeway's general pricing strategy was sometimes modified in light of market conditions. As the trial court explained: "For example, in a market where prices were rising – usually because wholesale fuel prices were rising for everyone – Safeway had a policy of never raising its price more than 2 [cents] per gallon from one day to the next on regular unleaded gas (80% of Safeway's volume) unless its surveyed competitors had all done so. Safeway's policy allowed the price of its two higher grades of gasoline to rise more rapidly compared to its target competitors than with regular gasoline."

The prices Safeway customers paid for fuel at the City of Dixon station were also influenced by the various promotions Safeway ran throughout the year. Relevant here, from 2004 to 2012, Safeway offered a promotion to customers holding a Safeway Club Card that allowed them to pay three cents less per gallon than Safeway's street price ("Safeway Club Card" program). Thus, under Safeway's general pricing policy (p. 3, above), Club Card customers would pay one cent per gallon below the lowest target competitor when margins were positive, and one cent per gallon above the lowest target competitor when margins were negative. Occasionally, however, Safeway's target competitors in a particular area would be hypermarkets or pricers, as opposed to majors. In these situations, Safeway would apply a different pricing strategy. Specifically, in recognition of the fact that these competitors may not "let" Safeway's Club Card fuel price be lower than the competitors' price, and thus to avoid a "price war," Safeway would set its street price three cents per gallon above the lower target competitor so that the Club Card price would match the lowest target competitor.

Safeway also employed other grocery-based fuel promotions during the relevant time period. For example, in or about 2004, Safeway introduced one-day "Stealth" promotions in Northern California and other areas, which involved making a surprise announcement over the grocery store intercom that, on that particular day only, Club Card members could receive an additional three-cent-per-gallon discount on their fuel

purchases. In this way, Safeway could build goodwill among its grocery customers without triggering a price response from its competitors.

In addition to the Safeway Club Card program, which was discontinued in 2012, Safeway offered another promotion that awarded fuel discounts to customers that bought specified amounts of qualifying groceries ("Rewards" program). For example, in 2011, Safeway introduced one such Rewards program that would allow grocery customers to earn a ten-cent-per-gallon fuel discount for every $100 they would spend on qualifying groceries during a specified time period. Undisputedly, promotions comparable to Safeway's Rewards program were being offered by all or nearly all of its major grocery competitors in the United States, and three retail fuel stations located near Safeway's City of Dixon fuel station permitted customers of the Kroger or Lucky grocery chains to redeem grocery-based promotions on their fuel purchases.

According to internal Safeway documents, and as verified by Safeway witnesses, Safeway's "core focus [was] its grocery business." As such, the "goal" of Safeway's fuel business was to "help maximize traffic in the main store, not necessarily to maximize revenue per gallon of gas sold." And the promotional discounts on fuel were considered rewards for its loyal grocery customers. According to the testimony of Anthony Silva, a Safeway vice president, while the Safeway fuel group initially helped formulate these fuel-discount promotional programs, eventually the tasks of designing, reviewing and implementing these programs were undertaken by the department responsible for grocery promotions, while the fuel group assisted in the promotions' implementation.

Safeway's internal accounting documents confirmed that the fuel-discount promotional programs led to increased grocery revenue and, indeed, an overall increase in net realized profit for the company even after the loss of fuel revenue and related costs of the discount program were considered. The evidence produced at trial thus confirmed that the promotional programs effectively generated additional grocery sales in an amount sufficient to offset the cost to Safeway of charging loyal grocery customers less for fuel purchases at its station.

5

In addition, evidence produced at trial reflected that several of Safeway's grocery-store competitors (to wit, the hypermarkets) offered similar fuel-discount promotional programs in the greater Dixon/Northern California area. For example, Raley's had a program in which a grocery customer could earn a 25-cent-per-gallon discount for spending $100 on groceries. According to Safeway's internal documents, managers who became aware of these sorts of promotional programs were encouraged to notify the marketing department so they could be considered for possible competitive response. These documents also reflect that, until late 2008, Safeway recognized as revenue at its City of Dixon fuel station only those payments made by customers. As such, if the customer paid a discounted price for gas, the loss would be reflected in the station's total revenue. After late 2008, however, Safeway changed this policy so as to charge the grocery-side of the business with the cost of any fuel discount received by a customer, and to then enter a corresponding credit to the fuel station. This permitted the fuel station to recognize as revenue both the payment for fuel received by the customer and the amount of the fuel discount the customer received from its purchase of groceries. The parties disagreed on the appropriateness of these methods, with Dixon arguing the earlier method (up to late 2008) was more accurate, and Safeway arguing in favor of the later method (after late 2008).

The court also heard from several "market participants," including the owners of nearby small independent fuel stations, who testified to the difficulties they faced trying to compete with Safeway's pricing and the resulting reductions in their volumes and margins. At least two such owners responded to these competitive difficulties by modifying their business plans. For example, the owner of two nearby stations, one in Dixon and the other in Lincoln, developed an "unattended truck stop" that allowed truckers with a "fleet card" to pull in and fuel their trucks. He also branded his station with Shell and, thus, was able to offer his customers discounts based on grocery rewards earned at SaveMart, a Shell partner. Another local owner began catering to big rig trucks, which Safeway's station was unable to accommodate. None of the market

6

participant witnesses had personal knowledge with respect to Safeway's fuel pricing or transaction costs.

Following presentation of Dixon's case-in-chief, Safeway moved for judgment pursuant to Code of Civil Procedure section 631.8.[6] The trial court granted this motion based upon the following conclusions set forth in its 36-page statement of decision. First, with respect to the first, second and third causes of action for below-cost sales and loss leaders in violation of the UPA (including the related UCL cause of action for unlawful business practices), the court found evidence that Safeway engaged in below-cost sales during at least some relevant periods of time to the detriment of Dixon. However, it further found the evidence established that Safeway did not act with the purpose of injuring its competitors or destroying competition; rather, the pricing was designed to improve its grocery business and to better compete with the fuel-based and other promotions offered by its grocery competitors, both valid economic strategies under California law. As such, Safeway could not be held liable for these practices under either section 17044 or section 17043 of the UPA. Second, with respect to the UCL cause of action for unfair business practices, the court found that Dixon had failed to offer any market-specific evidence that Safeway's fuel pricing was "unfair" within the meaning of the statute; rather, Dixon offered only anecdotal evidence that Safeway's below-cost sales harmed certain of its competitors, which is not the type of competitive harm for which a business may be held liable under California law. The court thus dismissed each of Dixon's claims and entered judgment in favor of Safeway, prompting this timely appeal.

---

[6]     In December 2012, Safeway moved for summary adjudication of all four causes of action as applied to Safeway's grocery-based fuel promotions based on certain of its affirmative defenses, as well as other legal grounds. The court partially granted this motion. Specifically, the court rejected Safeway's arguments for summary adjudication of the UCL claims, while agreeing as to the UPA claims that Dixon had failed to meet its burden of presenting evidence sufficient to create a triable issue as to Safeway's "purpose" in offering its grocery-based fuel promotions. Dixon then moved for reconsideration of this motion, and a hearing on the motion was scheduled for April 2013. Ultimately, however, after judgment was entered in favor of Safeway on all causes of action, Dixon's motion for reconsideration of the summary adjudication order became moot.

7

**DISCUSSION**

Dixon raises the following issues for our consideration. First, Dixon contends the trial court committed reversible error by ignoring three categories of evidence: to wit, (1) evidence that Safeway's challenged pricing practices had the effect of diverting trade or injuring competitors within the meaning of section 17044; (2) expert testimony that Safeway improperly and misleadingly allocated its fuel-sale costs to its grocery business; and (3) evidence that Safeway's fuel pricing strategy was designed with the purpose to injure or destroy competition in the fuel market. Second, Dixon contends the court misinterpreted or disregarded controlling United States Supreme Court or California Supreme Court case law with respect to two issues: to wit, (1) whether injury to one competitor constitutes "injury to competition" for purposes of proving a violation of the UPA or UCL; and (2) whether Safeway's pricing practices met the test for "unfairness" set forth by the California Supreme Court in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163, 168 (hereinafter, *Cel-Tech*) We address these issues in logical order below, starting with the legal issues.

**I.      Did The Trial Court Properly Apply Controlling Case Law?**

We begin by addressing Dixon's contentions that the trial court misinterpreted or disregarded controlling case law in reaching judgment before turning to Dixon's fact-based contention that the court ignored certain material evidence. By doing so, we can more-readily gauge whether the trial court ignored evidence that was material and, if so, whether Dixon was thereby prejudiced, a prerequisite to reversal. (See *Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1161 [no grounds exist for reversal on appeal absent a showing of prejudicial error].) As Dixon notes, whether a trial court properly applied the law to the facts of the case is generally subject to independent review on appeal. (E.g., *Crocker National Bank v. City & County of San Francisco* (1989) 49 Cal.3d 881, 888 [where "the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question [for the court] is predominantly legal and its determination is reviewed independently"].)

8

The gist of Dixon's legal challenge is that the court misapplied the law when, after properly finding that Safeway engaged in below-cost pricing at its fuel station to Dixon's detriment, the court "essentially held that, absent proof [that the company acted with the purpose of harming its competitors], no violation of [section] 17200 could exist." We, however, conclude Dixon misreads the court's decision.

As an initial matter, there is no real dispute in this case regarding the requirement of proving a company's "purpose" when challenging the legality of its pricing of a good or service below cost. Indeed, the law on this issue was settled long ago by our State's high court: "[T]o violate sections 17043 and 17044, part of the [UPA], which prohibit below-cost sales and loss leaders, a company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition. . . . [However], even if [the defendant's] actions lacked the purpose necessary to violate the Unfair Practices Act, they might be deemed unfair under the unfair competition law." (*Cel-Tech, supra,* 20 Cal.4th at p. 169.) The court explained this difference in proof under the UPA and UCL as follows: "The purpose of the [UPA] is 'to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.' (§ 17001.) It prohibits specific 'practices which the legislature has determined constitute unfair trade practices.' [Citation.] The prohibitions against purposeful below-cost sales and loss leaders (§ 17043, 17044) are two examples. The consequences of violating the [UPA] can be quite severe. A prevailing plaintiff may receive treble damages and attorney fees. (§ 17082.) The act even provides criminal sanctions. Any person who violates the act is guilty of a misdemeanor punishable by up to a $1,000 fine and six months' imprisonment. (§ 17100.) This severity might explain why the Legislature applied these sanctions to below-cost sales and loss leaders only when done with the *purpose* of injuring competitors or destroying competition. [fn omitted.] [¶] The [UCL] is independent of the [UPA] and other laws. Its remedies are 'cumulative . . . to the remedies or penalties available under all other laws of this state' (§ 17205), but its sanctions are less severe

9

than those of the [UPA]. Prevailing plaintiffs are generally limited to injunctive relief and restitution. (§ 17203; see [citations].) Plaintiffs may not receive damages, much less *treble* damages, or attorney fees. [Citations.] The law provides for civil penalties (e.g., § 17206) but contains no criminal provisions.

"In contrast to its limited remedies, the [UCL's] scope is broad. Unlike the [UPA], it does not proscribe specific practices. Rather, as relevant here, it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.) [Fn. omitted.] Its coverage is 'sweeping, embracing' 'anything that can properly be called a business practice and that at the same time is forbidden by law.' [Citations.] It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.]" (*Cel-Tech, supra*, 20 Cal.4th at pp. 179-180.)

The California Supreme Court then went on to prescribe a test, without the "purposefulness" requirement, for determining whether a company's pricing practices were otherwise "unfair" for purposes of the UCL. (See *Cel-Tech, supra*, 20 Cal.4th at p. 189 ["Pricing practices that have the *effect* of harming competition may be unfair even if done without the purpose necessary to violate the Unfair Practices Act"].) Under this test, "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra*, 20 Cal.4th at p. 187.) In adopting this test, the high court explained that "[c]ourts must be careful not to make economic decisions or prevent rigorous, but fair, competitive strategies that all companies are free to meet or counter with their own strategies. Companies that cannot compete with others that are more capable or efficient may lawfully fail." (*Cel-Tech, supra*, 20 Cal.4th at p. 185.)

It is this test that we must determine whether the trial court properly applied. Having read the extensive statement of decision, we have no trouble concluding that the

court did so. Indeed, the court quoted at length from the *Cel-Tech* decision, correctly noting that "the question of Safeway's 'purpose' is no longer relevant" under the UCL, and that the issue, instead, was whether Safeway's fuel-pricing practices threatened an incipient violation of an antitrust law, or violated the policy or spirit of one of those laws, or otherwise significantly threatens or harms competition. At the same time, however, the court made clear that the mere fact that a price is set below cost and thereby injures one or more competitors does not establish unfairness under the UCL. Rather, the plaintiff must prove that the pricing is set at predatory levels, such that the competition suffers antitrust injury, not just injury from robust, yet otherwise fair, competition: " '[T]he antitrust laws . . . were enacted for the "protection of competition, not competitors." ' (*Cargill, Inc. v. Monfort of Colorado, Inc*. (1986) 479 U.S. 104. 115.)" (*Cel-Tech Communications, Inc. , supra*, 20 Cal.4th at p. 186.) Given that premise, it is not enough for a plaintiff alleging that a competitor's pricing practices are "unfair" to offer evidence that those practices "hurt" the plaintiff or make it more difficult for the plaintiff or others to compete. Indeed, to hold otherwise would discourage the very price competition the antitrust laws are designed to protect and foster. (*Cel-Tech Communications, Inc. , supra*, 20 Cal.4th at p. 189, citing *Atlantic Richfield Co*. [*v. USA Petroleum Co*. (1990) 495 U.S. 328, 340] ["Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition"], and *Cargill, Inc., supra*, 479 U.S. at p. 116 ["Courts must not prohibit 'vigorous competition' nor 'render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t us in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition" ' "].)

The court also quite properly pointed out that a plaintiff seeking to establish "unfair" pricing under the UCL has the burden of introducing evidence relating to the relevant market structure and the challenged conduct's effects or potential effects on this market structure. This showing would include, for example, evidence relating to market share, market concentration levels and barriers to market entry. In doing so, the trial

11

court noted that, in *Cel-Tech*, the California Supreme Court focused on the cellular service market's unique government-backed duopoly market structure when suggesting there may be grounds on remand for finding "unfairness" within the meaning of the UCL. (*Cel-Tech, supra*, 20 Cal.4th at pp. 189-190.) In our case, however, the trial court concluded Dixon had completely failed to offer any sort of market evidence, offering instead only "anecdotal" testimony from market competitors that their business had been harmed by Safeway's pricing. In the court's words: "There are no market definitions, no market share evidence, no market structure analysis, no assessment of the extent or risk of market power, nothing, zip, nada." In the absence of such evidence, the trial court concluded that, even assuming Dixon is correct that, for purposes of proving unfair pricing under the UCL, a plaintiff need not meet all the criteria set forth in federal predatory pricing cases such as *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.* (1993) 509 U.S. 209, 224-226, in our case, whether or to what extent a plaintiff must meet this federal law criteria is wholly academic given that none of the criteria has been met.[7]

Moreover, as the trial court observed, the witnesses at trial generally agreed that the number of fuel stations in Dixon had actually grown over time and that, when one fuel station closed, another would take its place. In addition, there was evidence that the fuel station operators had been adapting to the more competitive environment. For

---

[7] Contrary to Dixon's contentions, the trial court did not misinterpret *Cel-Tech* "to require federal predatory pricing rules," or fail to recognize that *Cel-Tech* permits a showing of "unfairness" to be tethered to California public policy without reference to federal law. Rather, the trial court expressly recognized in the statement of decision that federal antitrust is *persuasive*, but not controlling on California courts addressing UCL or UPA claims. (*Cel-Tech, supra*, 20 Cal.4th at p. 186, fn. 11.) The court also correctly noted that the *Cel-Tech* court itself looked to federal antitrust standards for guidance, rather than the UPA, to determine what sort of low pricing practices might meet the test for unfairness under the UCL. (See *Cel-Tech, supra*, 20 Cal.4th at pp. 189-190.) However, given the *absence of any evidence in this record* demonstrating Safeway's pricing was unfairly low, as opposed to just simply low, the trial court had a valid legal basis for declining to inquire more deeply into what precisely a plaintiff must show to prevail on these claims.

example, Dixon had expanded its site to attract more truckers, and other fuel station competitors had teamed with the fuel discount programs of Safeway's grocery competitors. As the trial court pointed out, this evidence tended to prove the Dixon-area fuel market was healthy and competitive, with relatively low barriers to entry. At the same time, this evidence tended to disprove Dixon's theory that Safeway's below-cost unfair pricing was stifling robust competition.

Dixon does not challenge any of this evidence, nor does it challenge the trial court's conclusion drawn from this evidence that, while competition in the relevant market may have gotten more "painful" due to Safeway's aggressive price practices, it had not suffered the kind of threat or harm that antitrust laws were designed to eliminate. We thus uphold the trial court's reasoning and conclusion on the unfairness issue. As the California Supreme Court warned when adopting the *Cel-Tech* standard, "Courts must be particularly cautious in evaluating claims that a competitor's prices are too low. Pricing practices are not unfair merely because a competitor may not be able to compete against them. Low prices often benefit consumers and may be the very essence of competition. 'Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.' [Citation.] Courts must not prohibit 'vigorous competition' nor 'render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." ' [Citation.]" (*Cel-Tech, supra*, 20 Cal.4th at p. 189.) The trial court employed just this sort of cautious evaluation in finding the challenged pricing in this court was "vigorous competition" rather than unfair price cutting and, accordingly, committed no legal error.

## II. Did The Trial Court Commit Reversible Error By Ignoring Certain Key Evidence?

We are left with Dixon's ancillary evidentiary challenges.[8] Where, as here, the trial court's factual findings are challenged on appeal, "the power of [the] appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . ." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874; see also *Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1, 10 ["The standard of review after a trial court issues judgment pursuant to Code of Civil Procedure section 631.8 is the same as if the court had rendered judgment after a completed trial — that is, in reviewing the questions of fact decided by the trial court, the substantial evidence rule applies"].)

### A. Evidence regarding Safeway's purpose in setting fuel prices.

Dixon contends the trial court ignored evidence that Safeway's fuel pricing strategy was designed with the purpose to injure or destroy competition in the fuel market. This contention is, of course, an indirect challenge to the trial court's factual finding that Safeway did not act with the purpose to injure or destroy competition in the fuel market when setting its fuel prices. As such, under the standard set forth above, our inquiry is limited to whether substantial evidence supports this finding. (*Bowers v. Bernards, supra,* 150 Cal.App.3d at pp. 873-874.) We conclude that it does. To identify just some of this substantial evidence, Safeway documents and witness testimony revealed that, in developing its fuel pricing programs, the company was looking to attract more grocery customers and, indeed, was striving to keep up on a national and regional

---

[8]     Safeway contends we should deem Dixon's evidentiary challenges forfeited based upon the company's failure to provide a fair and complete summary of the relevant facts. (See, e.g., *Arechiga v. Dolores Press, Inc*. (2011) 192 Cal.App.4th 567, 571.) According to Safeway, Dixon's brief identifies only those facts favorable to its case in violation of well-established rules of appellate procedure. We tend to agree with Safeway on this issue. Nonetheless, in recognition of the public policy favoring decisions reached on the merits, we proceed to Dixon's substantive arguments.

14

basis with its grocery competitors, including national chains such as Costco, Albertson and Kroger (to wit, the hypermarkets). Several of these grocery competitors had implemented comparable fuel-discount programs to reward its grocery customers.[9] Moreover, there was evidence at least some of these grocery competitors charged the cost of their fuel-based promotions to the grocery-side of their business, just like Safeway did, even where the grocery competitor partnered with an independent fuel operator and did not operate its own fuel stations.

With respect to Exhibit 1, which Dixon contends supports its position that Safeway acted with an improper purpose, as the trial court correctly noted, this document expressly identifies the "goal" of Safeway's fuel business as "help[ing] to maximize traffic in the main store, not necessarily to maximize revenue per gallon of gas sold." The trial court interpreted this statement to mean that "Safeway's purpose in both its pricing and with all of its discount programs was to compete more effectively in the market for groceries." This interpretation in wholly reasonable, as well as consistent with testimony offered at trial by Safeway representatives. As such, it is not subject to second-guessing by this court. (*Medrazo v. Honda of North Hollywood, supra,* 205 Cal.App.4th at p. 10.) Dixon's challenge with respect to the evidence of Safeway's legitimate purpose in setting fuel prices thus fails.[10]

---

[9] In finding that Safeway did not act with the purpose of inflicting injury, the trial court credited the testimony of several Safeway officers or employees, including S. Patel, G. Wood, J. Pettus, S. Olea, and A. Silver, as well as Safeway Exhibits 1121, 1123 and 1125. Dixon presents no challenge to the admissibility or weight of this evidence.

[10] Thus, while Dixon is correct that, under the UPA, "[p]roof that a defendant sold or distributed articles or products below cost will be 'presumptive evidence of the purpose or intent to injure competitors or destroy competition' (§ 17071)" (*Pan Asia Venture Capital Corp. v. Hearst Corp.* (1999) 74 Cal.App.4th 424, 432), in this case the trial court had a sufficient evidentiary basis for concluding that any such presumption had been successfully rebutted by Safeway.

15

**B.    Evidence That Safeway's Pricing Had An Injurious Effect On Competition.**

Our rejection of Dixon's first evidentiary challenge also disposes of its second such challenge.  Specifically, Dixon contends the trial court ignored evidence that Safeway's fuel-based pricing practices had the "effect" of diverting trade or injuring competitors in the fuel market within the meaning of section 17044 and section 17030, subdivision (c).  However, we need not reach this issue because the trial court's finding that Safeway did not act with the purpose of injuring competitors or destroying competition forestalls any finding of liability with respect to Safeway on Dixon's causes of action under section 17044 or section 17043.  (*Cel-Tech, supra,* 20 Cal.4th at p. 168.)

In a related legal argument, Dixon contends the trial court "implicitly" ignored case law holding that injury to a single competitor suffices to establish "injury to competition."  (See *Marin County Bd. of Realtors v. Palsson*  (1976) 16 Cal.3d 920, 935 ["An anticompetitive practice 'is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy' "].)  However, as an initial matter, we do not read the record in this case to reflect any such misunderstanding of the law by the trial court.  Moreover, even if we could, there would still be no basis for reversal in this case, because, as the trial court correctly recognized, the mere fact of injury – whether to one or several competitors – is not enough to prevail under either the UCL or UPA.  Rather, as stated above, to prevail under the UPA, the plaintiff must prove, among other things, that the defendant acted with the purpose of harming competition or injury competitors, which, in this case, Dixon did not do.  (Pp. 15-16, *ante*.)  Further, and also discussed above, where a pricing practice is challenged as "unfair" under the UCL, the plaintiff must show the defendant engaged in "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  (*Cel-Tech, supra*, 20 Cal.4th at p. 187.)  Here, for all the reasons already stated, Dixon did not meet this test.  (Pp. 12-14, *ante*.)

16

## C. Safeway's Allocation of Fuel-Based Costs.

Finally, Dixon contends the trial court ignored testimony from its accounting expert, Celeste Plaister, CPA, that Safeway improperly and misleadingly allocated its fuel-sale costs to its grocery business. Specifically, Plaister testified that, among other things, it was misleading for Safeway to allocate the costs of its fuel rewards (i.e., the discounts awarded to grocery customers to apply to their subsequent fuel purchases) to its grocery business because "it makes the financial statements appear as if they are making money at the [fuel] station when, in fact, they are not."

As Safeway points out, under the UPA, whether a company's allocation of a particular cost of doing business comports with generally accepted accounting practices is a question of fact left to the trial court. (See *Pan Asia Venture Capital Corp. v. Hearst Corp.* (1999) 74 Cal.App.4th 424, 438 [noting that "imperfections [in a cost allocation analysis] would go to the weight the jury ought to give [the expert's] testimony, but they do not make it wholly illegitimate"].) Here, Safeway presented evidence that its policy, implemented in 2008, of charging its grocery business with the cost of its fuel discounts and then entering a corresponding credit to the fuel station (such that the fuel station's revenue reflected both the customer's payment for fuel and the customer's total discount on fuel) was appropriate. For example, the evidence reflected that Safeway's accounting method was consistent with that employed by other large grocery chains offering comparable fuel-discount promotions. Further, when these large chains partnered with independent fuel stations or resellers, the evidence revealed that the normal procedure was for the sponsoring grocery chain to pay the participating fuel station for the discounts redeemed by the grocery chain customers at the station. Thus, in other words, the independent fuel station would receive revenue from two sources (to wit, the customer's payment and the grocery chain's payment for the customer's discount), just like Safeway's City of Dixon fuel station received two sources of revenue (to wit, from the customer and from the grocery-side of Safeway's business).

Dixon has challenged neither the admissibility nor weight of this evidence, which the trial court ultimately accepted over Plaister's expert testimony. Specifically, the court

17

found that "the costs of these [fuel] promotions were properly attributed to the grocery-side of the business.  This conclusion is supported by Plaintiff's own accounting expert, who acknowledged that it is a basic principle of accounting to match costs to the corresponding revenue stream [cite], which suggests here the cost of using fuel discounts to promote the sale of groceries should be matched to the grocery revenue stream generated by those promotions."

While Dixon insists the trial court misreads Plaister's testimony on this point, the fact remains that the court's decision to accept the evidence justifying Safeway's allocation of the fuel-discount cost to the grocery-side of its business, and to reject Dixon's contrary evidence, was appropriate on this record.  We, thus, decline to disturb the trial court's judgment.  (See *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632 [" 'expert testimony, like any other, may be rejected by the trier of fact, so long as the rejection is not arbitrary' "]; see also *People v. Silver* (1991) 230 Cal.App.3d 389, 396 ["Our system of justice is based on trust in the ability of the finder of fact, whether judge or jury, to properly assess the credibility of experts"].)

Finally, even assuming for the sake of argument that the trial court's finding lacked sufficient evidentiary support, Dixon has failed to demonstrate any resulting prejudice on this record.  As the trial court's statement of decision makes clear, its finding with respect to the appropriateness of Safeway's cost-allocation method was "for UPA purposes."  In other words, the court was addressing whether Safeway violated section 17043 (below-cost sales) or section 17044 (use of loss leaders).  As stated several times already herein, both of these statutes require proof that the defendant acted with an improper purpose to harm competition or injure a competitor.  Thus, given our earlier conclusion that the trial court properly dismissed Dixon's UPA claims for lack of the requisite proof of purpose, any error with respect to the court's treatment of Plaister's testimony is simply beside the point.

## DISPOSITION

The judgment is affirmed.  Dixon shall bear costs on appeal.

18

_____
Jenkins, J.

We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.


*Dixon Gas Club, LLC v. Safeway Inc.*, A139283