Filed 9/11/15  Metamorfyx, LLC v. Vanek, Vickers & Masini CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| METAMORFYX, LLC et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> VANEK, VICKERS & MASINI et al., <br><br> Defendants and Respondents. | B252798 <br><br> (Los Angeles County <br> Super. Ct. No. BC444780) |
| METAMORFYX, LLC et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> VANEK, VICKERS & MASINI et al., <br><br> Defendants and Appellants. | B256069 <br><br> (Los Angeles County <br> Super. Ct. No. BC444780) |

APPEALS from a judgment of the Superior Court of Los Angeles County. Joseph R. Kalin, Judge. Affirmed in part, reversed in part, and remanded.

Blecher Collins Pepperman & Joye, Maxwell M. Blecher, Howard K. Alperin, Theo "John" Giovanni Arbucci, and Jordan L. Ludwig for Plaintiffs and Appellants Metamorfyx, LLC, Robert Granadino and Hernan Camacho.

Murphy, Pearson, Bradley & Feeney, James A. Murphy, Harlan B. Watkins and Geoffrey Macbride for Defendants and Appellants Vanek, Vickers & Masini, Eugene M. Cummings, P.C., Joseph Vanek, Eugene M. Cummings, and Brian Cardoza.

* * * * * * * *

This is an appeal from the grant of nonsuit in a legal malpractice case. Plaintiffs patented an ergonomic computer keyboard and licensed it to Microsoft and others. Defendants advised plaintiffs regarding the license agreement with Microsoft and the license agreements with others. Plaintiffs claimed their advice cost plaintiffs millions of dollars in lost royalties from Microsoft because their negotiation of the terms of the Microsoft license agreement fell below the standard of care.

The chief contention on appeal is the trial court erred in ruling plaintiffs' damages expert could not rest his opinion on Microsoft sales data produced by Microsoft's counsel in an earlier arbitration between Microsoft and plaintiff Metamorfyx. The trial court reasoned that since no Microsoft witness laid a foundation for its admission as a business record, it was unreliable hearsay. This ruling meant plaintiffs could not prove the essential element of damages. The parties reached a stipulation to truncate the trial to expedite appellate review. In addition to granting nonsuit for lack of proof of damages, the court granted nonsuit for failure to prove causation.

We agree the trial court prejudicially erred in effectively excluding the testimony of plaintiffs' damages expert, and that substantial evidence would support a judgment in favor of plaintiffs on causation. We reverse for a new trial. We also find the court erred on granting nonsuit on the ground that plaintiffs failed to prove defendant Brian Cardoza committed any wrongful conduct. We affirm the grant of nonsuit on the ground plaintiffs Robert Granadino and Hernan Camacho lacked standing to sue defendants for their negligent handling of the Microsoft license agreement negotiations. Consolidated with this appeal is defendants' appeal of the court's attorney fee award. Since we reverse the

judgment for defendants, we also reverse the award of attorney fees to defendants, as defendants are no longer the prevailing parties.

## BACKGROUND

### 1. Plaintiffs' Case

In accordance with the standard of review, our summary of the evidence indulges every legitimate inference which may be drawn from the evidence in favor of plaintiffs.

Plaintiffs Hernan Camacho and Robert Granadino formed plaintiff Metamorfyx to obtain patents for their designs of ergonomic keyboards. After they obtained their first two patents, they began to notice there were potentially infringing keyboards in the market. Eventually, Metamorfyx retained defendants Eugene Cummings, Joseph Vanek, and Brian Cardoza, to license and prosecute Metamorfyx's patents. The biggest infringer was Microsoft but there were many other infringers. In the course of litigation, nearly every major manufacturer of ergonomic keyboards agreed to license Metamorfyx's patents.

Defendants negotiated with Microsoft. During negotiations, Microsoft filed a request with the United States Patent and Trademark office to reexamine six claims of a Metamorfyx patent. The patent survived the reexamination. During the reexamination process, Microsoft made an offer to pay a royalty per keyboard for certain keyboard types and a "modest" paid-up license for other keyboard types that Microsoft contended were invalidly patented. In 1997, plaintiffs entered a license agreement with Microsoft, on the advice of counsel, which they describe on appeal as a sale of the bulk of Metamorfyx's patent portfolio rights, past, present and future, for a one-time fee of $400,000.

Later, in 2008, plaintiffs asked defendants to investigate what they believed were infringing keyboards of Microsoft. Metamorfyx pursued arbitration with Microsoft as provided in their agreement. The arbitration concerned keyboards that were manufactured by Microsoft after Microsoft entered the license agreement with Metamorfyx. Defendants withdrew from representing plaintiffs some weeks before the arbitration hearing. New counsel, Julien Adams, substituted in. Metamorfyx lost.

The arbitrators found "[t]he License Agreement does not provide, as many licenses do, that royalties are due if the products would infringe any claims of the licensed patents." Instead, the arbitrators found that royalties would only be owed for keyboards that both infringed the patents and also fell within the contract definition of the term "royalty bearing keyboards," which only included keyboards with "legs pivotally attached to the keyboard for elevating the wrist support . . . ." The arbitrators found the Microsoft keyboards did not literally infringe the patents. Metamorfyx argued it was still entitled to unpaid royalties under the "doctrine of equivalents" which allows recovery even when there is no literal infringement of the patent. (*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.* (1997) 520 U.S. 17, 21.) However, the arbitrators found the doctrine of equivalents did not apply to aid in interpreting the contract definition of "royalty bearing keyboards."

Marc E. Hankin testified at trial for plaintiffs as an expert patent attorney, to offer his opinion that the license agreement fell below the standard of care by limiting the payment of royalties to the contract definition of "royalty bearing keyboards." First, he explained how the patent law protects inventors and how an owner of patent rights can recover damages for patent infringement and enter a license agreement to obtain royalty payments for future use of the patented design. Mr. Hankin testified the typical license agreement requires payment of a royalty for any product that "infringe[s] one or more claims of the licensed patents." Throughout his 21-year career in patent licensing, he has seen the phrase "infringe[s] one or more claims of the licensed patents" or a similar phrase to describe the scope of the license. This phrase is used in a "standard or typical license agreement" of the type he drafts for his clients and has seen in other licenses, including other Metamorfyx licenses and other Microsoft licenses. He opined that Metamorfyx's agreement with Microsoft was not a standard license agreement because it limited the payment of royalties based on contract terms much more restrictive than Metamorfyx's patents.

Mr. Hankin explained that the standard license agreement requires payment of a royalty for each product that infringes any element of a patent claim. In contrast,

4

Metamorfyx's agreement with Microsoft required payment of a $1 per unit royalty only for "royalty bearing keyboards" that the agreement described as having "support legs pivotally attached to the keyboard for elevating the wrist support of the keyboard." Mr. Hankin explained that the contract definition of an infringing product was "unduly limiting"; "[i]t's adding elements to a patent that was issued as valid;" and "it's changing the patent in the way it's interpreted in a way that the patent office did not anticipate."

Mr. Hankin also testified Metamorfyx's agreement with Microsoft excluded the obligation to pay royalties on keyboards that are imported into the United States and then exported again, which in his experience was "not standard at all." Mr. Hankin testified the definition of "royalty bearing keyboards" in the Microsoft agreement offered "no advantage, only disadvantage" to Metamorfyx and therefore the license agreement fell below the standard of care. Mr. Hankin clarified that "the license agreement did not rise to the level of the standard of care that a reasonably prudent patent attorney would have engaged in, in negotiating a patent license."

Plaintiffs planned to call Karl Schulze to testify as a damages expert. He had prepared a lengthy report with supporting exhibits explaining how he calculated plaintiffs' damages. He was prepared to testify that plaintiffs suffered damages related to the Microsoft agreement of almost $27,898,000 based on a royalty rate of $1 per unit. Mr. Schulze based his calculations in material part on a Microsoft document plaintiffs' counsel had given to him that reported Microsoft's keyboard sales in the United States for the period 2006 through 2009. It was his understanding that the information that formed the basis of his opinions regarding damages related to the Microsoft agreement was produced to the defendants during the time they represented Metamorfyx in the arbitration against Microsoft.

Defendants had moved in limine to exclude Mr. Schulze's testimony but the trial court denied the motion. However, defendants renewed their motion during trial before plaintiffs called Mr. Schulze to the stand. The court received additional briefing, entertained argument, and ruled that although Mr. Schulze could testify, he could not offer any opinion based on the Microsoft sales data.

Since damages are an essential element of a malpractice claim, and the court ruled that Mr. Schulze could not offer his opinion of Metamorfyx's damages based in material part on the Microsoft sales data, the parties reached a stipulation to truncate the trial and expedite appellate review. They stipulated that, if Julien Adams were called as a witness, he would testify that he had represented Metamorfyx in the arbitration against Microsoft, and that on or about January 7, 2010, he received an email from Microsoft's outside counsel attaching the Microsoft sales data on which Mr. Schulze relied in calculating damages. Further, they stipulated that if the court ruled plaintiffs had no competent evidence to prove damages, then plaintiffs would truncate the remainder of their case. Defendants stipulated they would not contend that the appeal of the judgment of nonsuit was procedurally flawed, premature or not ripe because plaintiffs did not present all their evidence. Further, they stipulated that if the judgment were reversed and remanded, then plaintiffs could call Mr. Vanek and Mr. Granadino to testify despite having not called them at the first trial due to the stipulation.

Defendants then moved for nonsuit, for failure to prove damages, and on additional grounds discussed below.

## 2. The Trial Court's Ruling on the Motion for Nonsuit

The court granted nonsuit on four grounds that we state here in the order in which we address them in this opinion.

First, the court found plaintiffs Robert Granadino and Hernan Camacho lacked standing to sue defendants for their negligent handling of the Microsoft license agreement negotiations because these plaintiffs had assigned all of their rights and interest in the Metamorfyx patents to Metamorfyx in May 1997.

Second, the court found plaintiffs failed to prove liability in two respects. (1) Microsoft would have agreed to a more favorable license agreement; and (2) that Microsoft keyboards infringed any Metamorfyx patents.

Third, the court found plaintiffs failed to present admissible evidence of damages.

Fourth, the court found plaintiffs failed to prove defendant Brian Cardoza committed any wrongful conduct.

6

**DISCUSSION**

"A motion for nonsuit or demurrer to the evidence concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27-28 (*Edwards*).) Our review is de novo. (*Baker v. American Horticulture Supply, Inc*. (2010) 185 Cal.App.4th 1295, 1308 (*Baker*).)

1.      **Standing of Plaintiffs Granadino and Camacho**

Although Mr. Granadino and Mr. Camacho purport to join Metamorfyx in this appeal, their briefs on appeal are silent on the question of their standing to seek damages related to the Microsoft agreement. In the absence of any demonstrated error, we will affirm the grant of nonsuit as to the individual plaintiffs. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 [it is the appellant's burden to demonstrate error].)

2.      **There Was Substantial Evidence to Support a Verdict for Plaintiff Metamorfyx on Liability**

Defendants moved for nonsuit in part by arguing plaintiffs had not proved the alleged negligent negotiation of the Microsoft license agreement caused Metamorfyx any damages. The plaintiff in a transactional legal malpractice action such as this one must prove that a more favorable result would have been obtained but for the alleged negligence. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241.) The court granted nonsuit for failure to prove causation on two grounds. First, the court found plaintiffs failed to prove Microsoft would have agreed to a more favorable license agreement. Second, the court found plaintiffs failed to prove that Microsoft keyboards infringed any Metamorfyx patents. Plaintiffs have consistently asserted this case is about "a botched license agreement" and not about negligent prosecution of patent infringement.

7

We find plaintiffs submitted substantial evidence from which the jury might reasonably infer that Microsoft would have agreed to a more favorable license agreement. Mr. Hankin's expert testimony was substantial evidence from which the jury might infer that defendants' malpractice caused Metamorfyx to lose the opportunity to recover royalties to which it would have been entitled if defendants had negotiated for a standard license agreement rather than the more restrictive agreement they advised plaintiffs to enter. That no Microsoft witness testified at trial that Microsoft would have agreed to more favorable terms does not render Mr. Hankin's opinion mere speculation.

In *Viner v. Sweet*, *supra*, the Supreme Court rejected the argument that the "but for" test of causation should not apply to transactional malpractice cases because it would be too difficult to prove causation. Mr. and Mrs. Viner, the clients-plaintiffs, argued "that proving causation under the 'but for' test would require them to obtain the testimony of the other parties to the transaction, who have since become their adversaries, to the effect that they would have given the Viners more favorable terms had the Viners' attorneys not performed negligently." (*Viner v. Sweet*, *supra,* 30 Cal.4th at p. 1242.) The Supreme Court responded: "Not so. In transactional malpractice cases, as in other cases, the plaintiff may use circumstantial evidence to satisfy his or her burden. An express concession by the other parties to the negotiation that they would have accepted other or additional terms is not necessary. And the plaintiff need not prove causation with absolute certainty. Rather, the plaintiff need only ' "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." ' " (*Id.* at pp. 1242-1243.)

Put simply, plaintiffs' theory of the case was that the Microsoft sales data showed over 27 million keyboards were sold in the United States between 2006 and 2009 for which a $1 per keyboard royalty would have been owed to Metamorfyx if defendants had stood firm in negotiating for a standard license agreement. Mr. Hankin testified that a typical license agreement would require the payment of royalties for any product that infringed any aspect of the patent. He identified specific license agreements Microsoft had entered with other parties that used this standard language, rather than the more

8

restrictive contractual definition of "royalty bearing keyboard" used in the Metamorfyx license agreement. Indeed, he testified he had been unable to find any other Microsoft license agreement entered during the time when defendants were negotiating with Microsoft that did not use the standard language requiring royalty payments for any product that infringed the patent. Metamorfyx lost its claim in arbitration for the payment of additional royalties in part because the arbitrators concluded the claimed infringing Microsoft keyboards did not fall within the contractual phrase "royalty bearing keyboard," and the doctrine of equivalents did not apply to contract interpretation. From this, the jury could have reasonably inferred that plaintiffs would have gotten a better deal from Microsoft if defendants had not been negligent in their negotiations and in advising plaintiffs to enter the Microsoft license agreement.

Alternatively, if plaintiffs had been permitted to prove their case, they may have been able to offer evidence to support a jury finding that they would have been better off by suing Microsoft for patent infringement rather than entering the Microsoft license agreement. Plaintiffs proved they had successfully sued other infringers, and defendants drafted a complaint against Microsoft but never filed it or threatened Microsoft with litigation unless Microsoft agreed to pay royalties for all products that infringed a Metamorfyx patent. We do not rest our analysis on a finding that plaintiffs presented sufficient evidence to prove causation on the theory that they would been better off by suing Microsoft rather than negotiating a license. We simply acknowledge that was one of plaintiffs' theories. Because plaintiffs truncated their case after the trial court pulled the rug out from under them on damages, we do not know whether they could have offered evidence to support the inference that litigation would have been better than the "botched" license agreement.

We turn briefly to the second basis for the court's grant of nonsuit for failure to prove causation, that plaintiffs failed to prove Microsoft keyboards infringed any Metamorfyx patents. Plaintiffs argue they would have presented evidence of infringement if the parties had not agreed to truncate the case on the issue of damages, and if the court had not excluded the bulk of their proffered evidence of infringement.

9

Plaintiffs called Mr. Adams to offer into evidence the claims charts Metamorfyx had used in the arbitration to prove that Microsoft had manufactured and sold infringing keyboards. The court sustained defendants' objections to the testimony of Mr. Adams concerning the claims charts.

When plaintiffs' counsel asked Mr. Adams if the claims charts were used in the arbitration, defendants objected on the ground of relevance. The court sustained that objection and also found Mr. Adams (Metamorfyx's counsel in the arbitration) could not lay a foundation for the admission of the claims charts. The court found that Mr. Vanek (who withdrew from representing Metamorfyx in the arbitration) could testify to the claims charts, but not Mr. Adams. In the end, plaintiffs did not call Mr. Vanek to testify because of the stipulation to truncate the trial.

Plaintiffs cite cases in their opening brief to support the proposition that claims charts are often used as evidence in patent disputes to demonstrate infringement. (See *Symbol Technologies, Inc. v. Opticon, Inc.* (Fed.Cir. 1991) 935 F.2d 1569, 1576; *Odetics, Inc. v. Storage Tech. Corp.* (Fed.Cir. 1999) 185 F.3d 1259, 1270.) Plaintiffs also cite a treatise for the proposition that, in proving causation by presenting a "trial within a trial," evidence that was presented in the underlying case is admissible as the best evidence of the events that transpired in the underlying action. "The record of the proceeding is not hearsay, because it is not used to establish the truth of the matters stated but to document what evidence was offered and what transpired." (See 4 Mallen et al., Legal Malpractice (2015) Litigation of the Legal Malpractice Action, § 37:148, p. 1845.) Therefore, plaintiffs argue, the claims charts were admissible evidence to prove various Microsoft keyboards infringed their patents. We are inclined to agree the court erred in excluding the claims charts as irrelevant and without foundation. Since Mr. Adams was precluded from offering any testimony about the claims charts, there is no record from which we may determine if the claims charts might have supported a jury finding of infringement.

Since we find there was substantial evidence of causation on the theory that Microsoft would have agreed to a more favorable license agreement, we need not further

discuss the grant of nonsuit for lack of evidence that Microsoft keyboards infringed Metamorfyx patents.

**3.    The Trial Court Prejudicially Erred in Effectively Excluding Plaintiffs' Evidence of Damages**

A nonsuit will be reversed where the trial court erroneously excluded expert testimony that would support a plaintiff's verdict on appeal. (*Lawless v. Calaway* (1944) 24 Cal.2d 81, 89-91.)

As described above, the trial court effectively prevented Mr. Schulze from ever taking the stand to testify to Metamorfyx's damages by ruling he could not rest his opinions on Microsoft sales data. Mr. Schulze based his calculations in material part on a Microsoft document plaintiffs' counsel had given to him that reported Microsoft's keyboard sales in the United States for the period 2006 through 2009. It was his understanding that the information that formed the basis of his opinions regarding damages related to the Microsoft agreement was produced to the defendants during the time they represented Metamorfyx in the arbitration against Microsoft. Mr. Schulze's damages analysis in Schedule 2 of his report separated the infringing keyboards into four groups and showed his estimate of annual U.S. sales and the unpaid royalties due at $1 per unit sold for each year within each group.

His notes to Schedule 2 describe the four groups. "Group 1 keyboards are defined as Microsoft keyboards which have pivotally attached legs toward the rear of the keyboard and a removable mount under the wrist support. [¶] . . . Group 2 keyboards are defined as Microsoft keyboards which have detachable support legs toward the front of the keyboard (under the wrist support). [¶] . . . Group 3 keyboards are defined as Microsoft ergonomic keyboards with support legs pivotally attached toward the rear of the keyboard, whereby support legs can be retracted elevating the front edge of the wrist support in relation to the underlying support surface. [¶] . . . Group 4 keyboards are defined as all other Microsoft keyboards which have elements contained within Metamorfyx Patents. For example, keyboards that have a curved first row (nearest to the user), a wrist support, and/or a planar layout of keys." Because Mr. Schulze was not

11

allowed to testify, we cannot determine on what basis he identified the infringing Microsoft units.

The trial court ruled Mr. Schulze could not rest his opinion on the Microsoft sales data because no Microsoft witness laid a foundation for its admission as a business record, so it was unreliable hearsay. The trial court prejudicially erred, because an expert may base an opinion on reliable hearsay, and we discern no basis for finding the Microsoft sales data was unreliable. (*Western Union Financial Services, Inc. v. First Data Corp.* (1993) 20 Cal.App.4th 1530, 1539, fn. 8 [summarily rejecting contention that trial court improperly admitted expert declarations into evidence because they relied on "hearsay outside the record," finding the hearsay issue "is a red herring" since an expert may base an opinion on reliable hearsay].)

"Expert testimony may . . . be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. [Citations.] Of course, any material that forms the basis of an expert's opinion testimony must be reliable. [Citation.] . . . [Citation.] [¶] So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony. [Citations.] And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion. [Citations.] [¶] A trial court, however, 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.' [Citation.] . . . [Citation.] [A] witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618-619.)

It was undisputed that Microsoft's outside counsel produced the sales data to plaintiffs' counsel, Mr. Adams, for use in the arbitration between Metamorfyx and Microsoft. Plaintiffs provided defense counsel and the court with a copy of an email

stream between Microsoft's counsel and plaintiffs' counsel, along with hundreds of pages of data marked "confidential" bearing Microsoft Bates numbers. We have examined this evidence and can detect no reason to find it is unreliable. Moreover, defendants have never claimed the email or the sales data are not authentic. (See *StreetScenes v. ITC Entertainment Group* (2002) 103 Cal.App.4th 233, 244 [defendant's unaudited financial statement was adequately authenticated by counsel for the defendant who produced it in response to the court's order to produce evidence of client's financial condition for punitive damages phase of trial].)

In *Notrica v. State Compensation Ins. Fund* (1999) 70 Cal.App.4th 911, 932-933, a business sued its workers compensation insurer for bad faith, claiming in part the insurer increased its reserves to put the carrier in a stronger financial position without considering the impact on its insureds. An expert testified for plaintiff that sales personnel for the insurer misled prospective insureds regarding the reserve standards. He rested his opinion in part on statements of the insurer's president that were published in an insurance industry trade journal. The trial court correctly overruled the insurer's objections on the grounds of hearsay and lack of foundation, reasoning that the president's remarks quoted in the trade journal were part of his explanation of the basis for his opinion why the insurer had changed its reserve policy. "With regard to [the insurer's] complaint that [the expert] read excerpts of the article to the jury, we note that when context is needed to understand what has transpired, the expert may read excerpts of the material relied upon to the jury." (*Id.* at p. 933.)

Based on these well-established principles, we find the court should have permitted Mr. Schulze to testify to his opinions based on the Microsoft sales data, and to describe the sales data, as necessary, to explain how it supported his opinions. Defendants' argument that no Microsoft witness was available to testify about the data goes to the weight of the evidence, and not to its admissibility.

The authorities cited by defendants do not support a different conclusion. In *People v. Coleman* (1985) 38 Cal.3d 69, 92-93, the Supreme Court reversed convictions of two counts of first degree murder, one count of second degree murder, and one count

13

of assault with intent to commit murder. The court found prejudicial error in the admission of three hearsay letters written by one of the victims (defendant's former wife) "a substantial period of time before her death, which referred to alleged prior threats against her by defendant and her fear of future violence." (*Id.* at p. 74.) The Supreme Court found the letters were "highly emotional and inflammatory," and the trial court erred under Evidence Code section 352 because their prejudice grossly outweighed the relevance to impeach defendant. The case is not helpful to us because it rests on a section 352 analysis of the balance of prejudice against relevance. The court here was not asked to, and did not undertake a section 352 analysis.

Defendants also cite, to no avail, *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, which held that experts "may not relate an out-of-court opinion by another expert as independent proof of fact. [Citation.] It is proper to solicit the fact that another expert was consulted to show the foundation of the testifying expert's opinion, but not to reveal the content of the hearsay opinion." (*Id.* at p. 416.) That holding is not instructive here because the opinions of Mr. Schulze did not rely in any part on the opinions of other experts. The *Continental Airlines* court also found the trial court erred in precluding the expert from testifying he relied on the cost and price figures submitted to him by the other experts in forming his opinion on damages, though the error was not prejudicial. (*Ibid.*) The holding that the court should have permitted the expert to testify to opinions based on data calculated by other experts supports plaintiffs' position, not defendants' position.

Also of no assistance to us is defendants' citation to *People v. Dean* (2009) 174 Cal.App.4th 186, affirming an order committing defendant as a sexually violent predator. The court rejected defendant's argument that expert testimony was admitted improperly because it rested on hearsay. Two experts testified on direct to many details contained within records of Atascadero State Hospital and other institutions describing things defendant said and did, or neglected to do, including many specific details of violent behaviors over the course of defendant's life that were far more prejudicial than probative. (*Id.* at pp. 197-198.) The court found the very detailed evidence about

14

defendant's behavior which the experts described at length was unreliable hearsay, but found no prejudicial error in its admission. (*Id.* at p. 201.) This case does not help defendants because here, plaintiffs did not propose to offer into evidence the details of the Microsoft email and attached sales data. In any event, the error in *Dean* was in the prejudicial nature of the specific details, not lack of foundation, authenticity or hearsay. (*Id.* at pp. 200-201.)

We do not find the citation to *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 138, instructive because it holds that damages awards may not rely on an expert's speculation. We are not persuaded, on this limited record, that Mr. Schulze's testimony would have rested on mere speculation. Likewise, neither *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487, nor *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1146-1147, is helpful, because those cases discuss expert testimony as to causation, which is of no assistance in considering the admissibility of Mr. Schulze's damages analysis.

### 4. Nonsuit as to Defendant Brian Cardoza

Defendants argue the court correctly granted nonsuit as to defendant Brian Cardoza because Mr. Hankin, plaintiffs' standard of care expert, testified to the standard of care of a patent attorney, and could not identify any services rendered solely by Mr. Cardoza, who is not a patent attorney. We find this argument much too simplistic, as it requires us to ignore the substantial evidence from which the jury could have inferred Mr. Cardoza performed work that fell below the standard of care.

The retainer agreement between plaintiffs and defendant Eugene Cummings stated, "In view of the scale and complexity of the present matter, we have agreed that additional lawyers, namely, Gerald D. Hosier, Joseph Vanek, and Brian Cardoza, will become associated with me in the handling of this matter." Mr. Cardoza testified he is not a patent attorney, and he was not involved in any of the negotiations of the license agreement with Microsoft. However, Mr. Cardoza also testified that he had "numerous" conversations with Mr. Granadino about the Microsoft license agreement. He was present with other lawyers when they discussed what would be a reasonable royalty rate

15

in the Microsoft license agreement. "Many times" he discussed with Mr. Granadino what effects Microsoft's request for a reexamination of the Metamorfyx patents might have, and the strengths and weaknesses of the Metamorfyx patents. Some years after Metamorfyx entered the license agreement with Microsoft, Mr. Cardoza participated in discussions about whether to pursue Microsoft for infringement.

It is plain that Mr. Cardoza was not the lead lawyer in advising plaintiffs about the Microsoft license agreement. The jury might have entered a judgment in favor of Mr. Cardoza. But, viewing the record in the light most favorable to the plaintiffs, and indulging every legitimate inference which may be drawn from the evidence in favor of plaintiffs, we cannot say there was no substantial evidence to support a verdict against Mr. Cardoza.

## DISPOSITION

We reverse the order granting nonsuit in all respects except for the grant of nonsuit in favor of defendants on the individual claims of Hernan Camacho and Robert Granadino. Specifically, we reverse the order granting nonsuit for failure to prove causation, damages, and that defendant Brian Cardoza committed no wrongful conduct. We therefore vacate the judgment and remand for a new trial on the claims of Metamorfyx against all defendants. We also reverse and vacate the award of attorney fees in favor of defendants. Plaintiffs and appellants are to recover their costs on appeal.


GRIMES, J.

I concur:

FLIER, J.



I concur with the judgment.


RUBIN, Acting P. J.


16